## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MAKAYLA MCCAIN,**
    **Plaintiff**

CIVIL ACTION

**VERSUS**

NO. 20-987

**JP MORGAN MORTGAGE
ACQUISITION CORP., ET AL.,**
    **Defendants**

SECTION: "E" (3)

## ORDER AND REASONS

Before the Court is Defendants Carrington Mortgage Services L.L.C. and J.P. Morgan Mortgage Acquisition Corporation's Motion for Judgment on the Pleadings.[1] Plaintiff filed an opposition to Defendants' motion.[2] For the following reasons, the Defendants' motion is **GRANTED** with respect to all claims except those alleged against Carrington Mortgage Services L.L.C. ("Carrington") under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692p.

## BACKGROUND

Plaintiff filed her second amended complaint on November 23, 2020.[3] In the second amended complaint, Plaintiff alleges multiple causes of action against the Defendants, JP Morgan Chase Bank, N.A. ("Chase"), JP Morgan Mortgage Acquisition Corporation ("JPMMAC"), and Carrington.[4] Plaintiff's causes of action stem from the following events alleged in Plaintiff's second amended complaint.

---

[1] R. Doc. 40.
[2] R. Doc. 52. Defendants filed a reply to Plaintiff's opposition at R. Doc. 56. Plaintiff filed a sur-reply at R. Doc. 59.
[3] R. Doc. 33.
[4] *Id.*

On May 26, 2010, Plaintiff purchased 127 Frances Street, Slidell, Louisiana.[5] Plaintiff executed a $73,440.00 promissory note at 5.25% interest per annum for thirty years, with principal and interest of $405.54 per month, in favor of NTFN Inc. d.b.a. Premier Nationwide Lending, secured by a note and mortgage encumbering 127 Frances Street, Slidell, Louisiana.[6] The original servicer on Plaintiff's loan was Chase.[7] On or about October 2014, Plaintiff's loan was sold by NTFN, Inc. to Chase.[8]

In spring of 2014, Plaintiff was notified she was delinquent on property tax payments, which she erroneously assumed were being paid from an escrow account associated with her loan.[9] In reality, her monthly mortgage payments did not include an amount to be escrowed for taxes. Plaintiff forwarded the delinquency notice to Chase, which paid the delinquent property taxes of $4,300.52, leaving Plaintiff's escrow account in deficit.[10] Chase divided the amount it paid for the delinquent taxes over the next twelve months and added that amount to Plaintiff's monthly mortgage payment, nearly doubling the amount owed each month from $571.17 to $1,044.29.[11]

Plaintiff fell behind on her loan payments and executed a Modification Agreement with Chase on April 1, 2015.[12] Under the Modification Agreement, Plaintiff agreed she owed $73,528.89.  Because she received a more favorable interest rate, her monthly payments of interest and principal were reduced to $375.78.[13] In late 2016, Plaintiff again

---

[5] *Id.* at ¶ 8.
[6] *Id.* at ¶ 9. Defendants agree at R. Doc. 40-1 at 1.
[7] *Id.* at ¶ 9
[8] *Id.* at ¶ 10.
[9] *Id.* at ¶ 11.
[10] *Id.* at ¶ 12.
[11] *Id.* at ¶ 12.
[12] *Id.* at ¶ 13.
[13] *Id.* at ¶ 13

experienced financial difficulties and was notified by Chase she was in default on her loan. On January 17, 2017, Plaintiff made a partial payment of $532.00 that was accepted by Chase and applied to her loan.[14]

Around the same time, Plaintiff filed an insurance claim for water damage to the wood flooring in the home.[15] Chase released $1,250.00 in insurance proceeds for the damage but withheld the $3,850.00 balance until repairs to the property are at least 90% complete. Carrington later advised Plaintiff the funds would not be released while monthly mortgage payments are not current.[16]

Plaintiff did not receive a mortgage statement in February 2017. On February 2, 2017, ownership of Plaintiff's loan was transferred to Carrington.[17] On February 2, 2017, servicing of Plaintiff's loan was transferred from Chase to Carrington.[18]  On March 16, 2017, Carrington mailed Plaintiff a delinquency notice advising Plaintiff she was in default on her loan.[19]

Plaintiff alleges she called Carrington on March 22, 2017 and advised of her intention to make a partial payment on the delinquent amount.[20] Carrington's representative told Plaintiff that, because she was in the first sixty days of a loan servicing

---

[14] *Id.* On March 3, 2017, Carrington mailed Plaintiff a Notice of Intent to Foreclose, due to her delinquency account.
[15] *Id.* at ¶ 14.
[16] *Id.* at ¶ 14.
[17] *Id.* at ¶ 16.
[18] *Id.* at ¶ 16; Defendants agree. *See* R. Doc. 40-1 at 1. On January 18, 2017, Carrington sent Plaintiff a "Hello Letter" notifying Plaintiff that Carrington would collect her mortgage loan payments effective February 2, 2017. R. Doc. 40-4 at 9.  Plaintiff also was sent Plaintiff a Notice of Sale of Ownership of Mortgage Loan to Carrington on February 9, 2017. R. Doc. 40-4 at 15. On March 3, 2017, Carrington mailed Plaintiff a Notice of Intent to Foreclose, due to her delinquent account. R. Doc. 40-4 at 59.
[19] *Id.* at ¶ 18.
[20] *Id.* at ¶ 19. According to Carrington's records, Plaintiff called Carrington on March 8, 2017.  R. Doc. 40-4 at 3.

transfer from Chase to Carrington, Carrington would process any payment received and that she would not be in a foreclosure status.[21] On March 24, 2017, Plaintiff sent a payment of $1,000.00 to Carrington via Moneygram and Plaintiff's church sent Carrington a check for $250.00. The $1,000.00 Moneygram payment and the $250.00 check were later returned as they were insufficient to cure the default.[22]

On March 10, 2017, Plaintiff applied to Carrington for mortgage assistance;[23] her application was later denied due to incompleteness. Several months after the denial, Chase notified Plaintiff that an error may have been made in the servicing of her loan that, if corrected, could have resulted in an extension of the document collection period for review of Plaintiff's application for mortgage assistance.[24] Plaintiff alleges, as compensation for its error, Chase tendered Plaintiff a check in the amount of $100.00.[25]

Plaintiff alleges that on April 3, 2017, Plaintiff's loan was transferred  from Carrington back to JPMMAC.[26] Plaintiff alleges that on May 18, 2017, JPMMAC commenced foreclosure proceedings against Plaintiff by filing a Petition for Executory Process in the 22nd Judicial District for the Parish of St. Tammany ("Action No. 17-017727").[27] On May 30, 2017, an order issuing a Writ of Executory Process was signed by the court, but at the request of JPMMAC, seizure and sale of Plaintiff's property was placed on hold.[28]

---

[21] *Id.* at ¶ 19.
[22] *Id.* at ¶ 20.
[23] *Id.* at ¶ 17.
[24] *Id.* at ¶ 17.
[25] *Id.* at ¶ 17.
[26] *Id.* at ¶ 21. The Defendants provided a Notice of Sale of Ownership of Mortgage Loan to JPMMAC dated April 10,2017. R. Doc. 40-4 at 31. The Court may take judicial notice of this public record. Fed. R. Evid. 201(c)(2).
[27] *Id.* at ¶ 22. The Defendants provided the certified record in this action. R. Doc. 40-2. The Court may take judicial notice of this public record. Fed. R. Evid. 201(c)(2).
[28] *Id.* at ¶ 22.

On June 5, 2017, Plaintiff sent a payment of $650.00 to Carrington via Moneygram.[29] On August 4, 2017, Plaintiff wrote to Carrington and forwarded the receipts for payments she made on her loan on March 28, 2017, and June 5, 2017, stating that her understanding of the March 22, 2017 call to Carrington was that her loan would not be in foreclosure status if she made a partial payment before March 28.[30] On August 7, 2017, Plaintiff was refunded the March 28, 2017 and the June 5, 2017 payments via Moneygram.[31]

On August 29, 2017, Plaintiff filed a formal complaint with the Consumer Financial Protection Bureau ("CFPB") challenging Carrington's tactics in proceeding to foreclose on her home in May 2017 despite the representations of Carrington's representations on the March 22, 2017 telephone call.[32] On September 27, 2017, Carrington responded by letter to Plaintiff's complaint via U.S. mail and the CFPB portal, apologizing to Plaintiff for the incorrect information given by the Carrington representative in the March 22, 2017 telephone call (hereinafter the "September 27, 2017 letter").[33] Plaintiff alleges that Carrington acknowledged she relied on the information provided by its representative.[34] To redress Plaintiff's grievances, Plaintiff alleges Carrington "promised" it would remove Plaintiff's account from foreclosure and waive any fees associated with the foreclosure proceedings and its rejection of the $1,000.00 Moneygram payment and $250.00 church

---

[29] *Id.* at ¶ 23.
[30] *Id.* at ¶ 24.
[31] *Id.*
[32] *Id.* at ¶ 25.
[33] *Id.* at ¶ 26. The Defendants provided a copy of the September 27, 2017 with attachments. R. Doc. 40-4.
[34] *Id.*

payment on behalf of Plaintiff.[35] Plaintiff alleges Carrington also agreed to suppress credit reporting against her for 60 days from the receipt of Plaintiff's CFPB claim.[36]

After receiving the letter, and in reliance on Carrington's promises, Plaintiff alleges she attempted to bring her account current.[37] On November 18, 2017, Plaintiff made an arrangement with Carrington's Loan Servicing Supervisor, Jhonatan Hernandez, to cure the arrears on her loan. Plaintiff alleges Hernandez instructed the amount to be paid to fully cure arrears was $6,468.27 and that he accepted the electronic transfer of funds in this amount from her father's checking account and advised Plaintiff that Carrington would accept Plaintiff's December payment over the phone as long as the payment was made before December 16, 2017.[38] Several weeks later, Carrington issued a refund check to Plaintiff in the amount of $6,498.27.[39] Plaintiff, unaware Carrington had issued a refund check, attempted to bring her loan current by making a payment on December 9, 2017, but was informed her loan remained in foreclosure status and her payment would not be accepted.[40]

Plaintiff alleges her contacts with Carrington included a phone call in November 2018, monthly mortgage statements received by U.S. Mail until her property was sold, occasional disbursements of small amounts of interest from Plaintiff's loss draft account, and several unrelated e-mails.[41] Other than these contacts, Plaintiff alleges Carrington has failed and/or refused to communicate with her regarding the status of her loan.[42] Plaintiff

---

[35] *Id.* at ¶ 27.
[36] *Id.* at ¶ 27.
[37] *Id.* at ¶ 28.
[38] *Id.* at ¶ 28.
[39] *Id.* at ¶ 29.
[40] *Id.* at ¶ 30.
[41] *Id.* at ¶ 31
[42] *Id.* at ¶ 31.

alleges errors by Chase and Carrington in servicing Plaintiff's loan resulted in incorrect credit reporting, to the detriment of Plaintiff's credit history.[43]

In November 2019, JPMMAC resumed foreclosure proceedings in Action 17-017727 by requesting issuance of a Writ of Seizure and Sale of Plaintiff's property, which was recorded in the record on November 20, 2019.[44] The Sheriff's Sale was scheduled for March 11, 2020.[45] On March 10, 2020, Plaintiff filed a Verified Petition for Damages against JPMMAC and Carrington in the 22nd Judicial District Court for the Parish of St. Tammany ("Action No. 2020-11287.")[46] The Plaintiff brought causes of action for breach of contract, unfair trade practices, negligence, violations of the Fair Debt Collection Practices Act, fraud, and conversion.[47] The Plaintiff also filed in Action No. 2020-11287 an Ex Parte Motion for a Temporary Restraining Order and Request to Set Hearing for Preliminary Injunction[48] seeking a TRO or an injunction against the sheriff's sale scheduled for the next day in Action No. 17-017727.[49] Plaintiff alleges she was unable to obtain counsel in Action No. 2020-11287 due to the complications of COVID-19.[50] The state trial court in Action No. 2020-11287 denied Plaintiff's motion for a temporary restraining order and request to set a hearing for preliminary injunction because the motion did not meet the notice requirements in Louisiana Code of Civil Procedure art.

---

[43] *Id.* at ¶ 32.

[44] *Id.* at ¶ 33; Defendants agree at R. Doc. 40-1 at 1. The Defendants provided a copy of the writ. R. Doc. 40-2 at 61-62. The Court may take judicial notice of this public record. Fed. R. Evid. 201(c)(2).

[45] *Id.* at ¶ 33. The Defendants provided the sheriff's notice of the sale date. R. Doc. 40-2 at 63.

[46] *Id.* at ¶ 34; R. Doc. 1-1 at 1-5. The Court may take judicial notice of this public record. Fed. R. Evid. 201(c)(2).

[47] R. Doc. 1-1 at 4-5.

[48] *Id.* at 53-55; *id.* at 53-55. Plaintiff also filed an Affidavit in Support of Ex Parte Motion for Temporary Restraining Order and Request to Set Hearing for Preliminary Injunction. *Id.* at 6-7.

[49] R. Doc. 33 at ¶ 34; Defendants agree at R. Doc. 40-1 at 2. Defendants note the state court denied Plaintiff's request on March 11, 2020, because the request "did not meet statutory requirements for notice to adverse party or irreparable injury." R. Doc. 40-3; *see* R. Doc. 1-1 at 58.

[50] *Id.* at ¶ 35.

3602 and because Plaintiff did not show irreparable injury.[51] At the sheriff's Sale on March 11, 2020, Plaintiff's property at 127 Frances Street in Slidell, Louisiana, was adjudicated in Action No. 2020-11287 to JPMMAC for the sum of $58,334.00.[52]

On March 23, 2020, Defendants removed Action No. 2020-11287 to this Court.[53] On July 20, 2020, Defendants filed their first motion for judgment on the pleadings.[54] On November 23, 2020, Plaintiff filed her second amended complaint,[55] and the Defendants' motion for judgment on the pleadings was denied as moot.[56] On December 21, 2020, Defendants filed their second motion for judgment on the pleadings.[57]

## LEGAL STANDARD

Under Rule 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."[58] "A motion brought pursuant to [Rule] 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts."[59] The standard for addressing a Rule 12(c) motion is the same as that used for deciding motions to dismiss pursuant to Rule 12(b)(6).[60] As a result, in deciding a Rule 12(c) motion, "the central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief."[61] "The [district] court may

---

[51] R. Doc. 40-3.

[52] R. Doc. 33 at ¶ 36. The Defendants provided a copy of the Sheriff's Deed to JPMMAC. R. Doc. 40-2 at 56-57. The Court may take judicial notice of this public record. Fed. R. Evid. 201(c)(2).

[53] R. Doc. 1; R. Doc. 1-1.

[54] R. Doc. 10,

[55] R. Doc. 33.

[56] R. Doc. 32.

[57] R. Doc. 40.

[58] Fed. R. Civ. P. 12(c).

[59] *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam).

[60] *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 209-10 (5th Cir. 2010).

[61] *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001) (quoting *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 440 n.8 (5th Cir. 2000)).

dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."[62] "In analyzing the complaint, [the Court] will accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."[63] The Court will not, however, "accept as true conclusory allegations or unwarranted deductions of fact."[64] When reviewing a Rule 12(c) motion, a district court must consider the pleadings, any documents the pleadings incorporate by reference, and matters of which the court may take judicial notice.[65]

## LAW AND ANALYSIS

Plaintiff brings claims for breach of contract, detrimental reliance, unfair trade practices in violation of La. R.S. 51:1409, the Louisiana Unfair Trade Practices Act; conversion; and unfair debt collection practices in violation of the Fair Debt Collection Practices Act.[66] In their motion for judgment on the pleadings, Carrington and JPMMAC first argue "Louisiana law does not permit a plaintiff to allow entry of an adverse judgment against her in a foreclosure suit, fail to timely contest the judgment, and then proceed to seek damages for purported claims existing at the time of judgment."[67] Defendants argue Plaintiff failed to timely pursue either of the two remedies available to her under Louisiana law to contest the foreclosure action: to seek an injunction or appeal the seizure and sale order.[68] Defendants next argue Plaintiff's claims are barred by res judicata.

---

[62] *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (per curiam) (citing *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990)).
[63] *Id.* (citing *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996)).
[64] *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quoting *Tuchman v. DSC Comm. Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).
[65] *NAZ, L.L.C. v. Philips Healthcare, a Div. Of Philips Elec. N. Am. Corp.*, Civ. A. No. 17-2882, 2018 WL 1202570 at *5 (E.D. La. Mar. 8, 2018) (citing *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2003)).
[66] R. Doc. 33.
[67] R. Doc. 40-1 at 1.
[68] *Id.* at 3.

Finally, Defendants argue that even if Plaintiff's claims are not time barred, they fail as a matter of law.[69]

## I. Plaintiff did not waive the claims in her Second Amended Complaint by failing to timely assert them.

Defendants first argue all of Plaintiff's causes of action are based on events that occurred before JPMMAC foreclosed on Plaintiff's property by executory process and these issues should have been raised as defenses in the foreclosure action.[70] As a result, Defendants argue Plaintiff waived her claims by failing to timely assert them.

Louisiana Code of Civil Procedure art. 2642 provides that "[d]efenses and procedural objections to an executory proceeding may be asserted either through an injunction proceeding to arrest the seizure and sale as provided in Articles 2751 through 2754, or a suspensive appeal from the order directing the issuance of the writ of seizure and sale, or both."[71] Louisiana Code of Civil Procedure article 2751 provides, "The defendant in the executory proceeding may arrest the seizure and sale of the property by injunction when the debt secured by the security interest, mortgage, or privilege is extinguished, or is legally unenforceable, or if the procedure required by law for an executory proceeding has not been followed." Louisiana courts have held that "a debtor seeking to object to an executory process proceeding may proceed in only two ways: (1) filing an injunction to arrest the seizure and sale, or (2) filing a suspensive appeal from the order of seizure and sale."[72],[73] In *Antione v. Chrysler Financial Corporation*, the court

---

[69] *Id.* at 1.

[70] *Id.* at 10.

[71] La. Code Civ. Proc. art. 2642.

[72] La. Code Civ. P. art. 2642; *see also Antoine v. Chrysler Fin. Corp.*, 782 So.2d 651, 652 (La. Ct. App. 2001).

[73] The Defendants argue Plaintiff also could have asserted the grounds listed in La. C.C.P. art. 2753A in response to the executory proceeding, and that she waived the right to raise those grounds later. None of those additional grounds listed in La. C.C.P. art. 2753A is the basis of the Plaintiff's claims in this case.

found "*all defenses and procedural objections to an executory process* proceeding are waived if the debtor allows the seizure and sale to proceed uncontested by either a suit for injunction or suspensive appeal."[74]

The Plaintiff in this case elected to object to the executory process proceeding by filing an injunction to arrest the seizure and sale. Plaintiff filed an Ex Parte Motion for a Temporary Restraining Order and Request to Set Hearing for Preliminary Injunction in Action No. 2020-1128[75] seeking a TRO or an injunction against the sheriff's sale scheduled for the next day.[76] Plaintiff's motion was unsuccessful. Not only did she fail to file her motion in a timely manner under La. C.C.P. art. 3602, as mentioned by the trial court judge, but she also did not allege any of the grounds required under La. C.C.P. art. 2751 to enjoin the sale—that her debt was legally unenforceable, that it had been extinguished, or that the procedure required by law for an executory proceeding was not followed. Plaintiff did not file a suspensive appeal of the order before the sheriff's sale occurred.

To the extent Plaintiff now wishes to assert there were defects in the executory process, as asserted in her fourth and fifth defenses to JPMMAC's counterclaim, those claims and defenses have been waived.[77] However, Plaintiff's causes of action asserted in her second amended complaint are not based on defenses or procedural objections to the executory proceeding. She does not allege her debt is legally unenforceable or her debt

---

[74] 782 So. 2d 651, 653 (La. Ct. App. 2001) (emphasis added).

[75] R. Doc. 1-1 at 53-55; *id.* at 53-55. Plaintiff also filed an Affidavit in Support of Ex Parte Motion for Temporary Restraining Order and Request to Set Hearing for Preliminary Injunction. *Id.* at 6-7.

[76] R. Doc. 33 at ¶ 34; Defendants agree at R. Doc. 40-1 at 2. Defendants note the state court denied Plaintiff's request on March 11, 2020, because the request "did not meet statutory requirements for notice to adverse party or irreparable injury." R. Doc. 40-3; *see* R. Doc. 1-1 at 58.

[77] R. Doc. 40 at 4.

has been extinguished or that the procedure required for executory process was not followed. Plaintiff now seeks money damages and not annulment of the sheriff's sale or the return of the property to her.[78]  Plaintiff's causes of action in her second Amended Complaint have not been waived under La. C.C.P. art. 2642.

## II.     The Claims against JPMMAC and Carrington are not barred by Res Judicata[79]

Defendants argue the doctrine of res judicata precludes any claims Plaintiff asserts against them in the second amended complaint.[80] Defendants assert the writ of seizure and sale in Action No. 2017-12331 issued on November 20, 2019[81] is res judicata as to the claims in the second amended complaint.[82] They argue all requirements of Louisiana law have been met as the order of seizure and sale is valid, the writ of seizure and sale acts as a final judgment, the parties to both proceedings are the same, Plaintiff's claims against JPMMAC and Carrington existed at the time of the foreclosure sale, and Plaintiff's claims in this action arise of the same transaction or occurrence as the executory process proceeding.[83]

"Res judicata is an issue and claim preclusion device found both in federal law and state law."[84] "The purpose of both federal and state law on res judicata is essentially the same; to promote judicial efficiency and final resolution of disputes by preventing

---

[78] *Avery v. Citimortgage, Inc. & Gulf Coast Bank & Trust Co.*, 15 So. 3d 240 (La. Ct. App. 2009).
[79] Plaintiff alleges Carrington violated the Unfair Debt Collection Practices Act ("FDCPA"), in violation of 15 U.S.C. § 1692e(8), by communicating to a credit bureau Plaintiff's credit information, which it knew or should have known was false or was disputed by Plaintiff. Carrington seeks judgment on the pleadings on this claim only on the basis of res judicata, which is denied.
[80] R. Doc. 40-1 at 3.
[81]. R. Doc. 40-2 at 61-62.
[82] R. Doc. 40-1 at 12.
[83] *Id*. at 12-13.
[84] *Terrebonne Fuel & Lube, Inc. v. Placid Ref. Co.*, 666 So. 2d 624, 631 (La. 1996).

needless relitigation."[85] The burden of proving the facts necessary to sustain the objection of res judicata is on the party pleading the objection, and if any doubt exists as to its applicability the objection must be overruled.[86]

Under the theory of *res judicata*, a court should "treat[] a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.'"[87] Federal courts "apply the *res judicata* principles of the state whose decision is set up as a bar to further litigation."[88] Because Defendants argue the order of seizure and sale in Action No. 2017-12331 acts as *res judicata* to preclude all claims in the second amended complaint, this Court must look to the *res judicata* law of Louisiana.[89]

Louisiana Revised Statute § 13:4231 provides:

Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:

(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment;

(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action;

---

[85] *Id.*

[86] *Pierotti v. Johnson*, 91 So.3d 1056 (La. App. 1st Cir. 2012).

[87] *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 436 (5th Cir. 2000).

[88] *Prod. Supply Co. Inc. v. Fry Steel, Inc.*, 74 F.3d 76, 78 (5th Cir. 1996) (quoting *E.D. Systems Corp. v. Southwestern Bell Tel. Co.*, 674 F.2d 453, 457 (5th Cir. 1982)).

[89] This is true unless the state's law is incompatible with federal interests. Louisiana's law of res judicata is very similar to federal criteria and is not incompatible with federal interests. *Chauvin v. State Farm Mutual Automobile Insurance Company*, 2007 WL 2903321 (E.D.LA. 2007).

(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, *with respect to any issue actually litigated and determined if its determination was essential to that judgment.*[90]

Although prior to 1991 Louisiana law on res judicata was substantially narrower than federal law, the 1991 amendments expanded the law to include issue preclusion.[91] Both claim and issue preclusion are termed res judicata under Louisiana law, but these two concepts are alike in result but distinctly different. In *Hudson v. City of Bossier*, the appellate court explained this distinction:

Under claim preclusion, a final judgment on the merits precludes the parties from relitigating matters that were or could have been raised in that action. Under issue preclusion or collateral estoppel, however, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue in a different cause of action between the same parties.[92]

La.C.C.P. art. 425 A also was amended in 1991 to provide: "A party shall assert all causes of action arising out of the transaction or occurrence that is the subject matter of the litigation." According to the Comment 1990 to Art. 425, "[t]his amendment expands the scope of this Article to reflect the changes made in the defense of res judicata and puts the parties on notice that all causes of action arising out of the transaction or occurrence that is the subject matter of the litigation must be raised." La.C.C.P. art. 1061 also was amended at that time to require the defendant to assert by reconventional demand all causes of action he may have arising out of the transaction or occurrence that was the subject matter of the first action.[93] Both La. C.C.P. art. 1061 and La. R.S. 13:4231 require that, to establish res judicata, the second cause of action must arise out of the transaction

---

[90] La. Rev. Stat. § 13:4231 (emphasis added).
[91] *Id.*; *Williams v. City of Marksville*, 839 So. 2d 1129 (La. Ct. App. 2003).
[92] 766 So. 2d 738, 743 (La. Ct. App. 2000); *see also Liberty Mut. Fire Ins. Co. v. Weaver*, 219 So. 3d 442, 445 (La. Ct. App. 2017).
[93] Comment (b) 1990 to § 4231.

or occurrence that is the subject matter of the first litigation. La. C.C.P. art. 1061 and La. R.S. 13:4231 are meant to be and must be read in pari materia.[94]

In *Burguieres v. Pollingue*,[95] the Louisiana Supreme Court established the five prerequisites for a finding of res judicata claim preclusion under the provisions of Sections 13:4231(1) and (2): (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of the final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation.

Under Section 13:4231(1) and (2) – or claim preclusion – the fourth requirement to establish res judicata is that the cause or causes of action asserted in the second case existed at the time of the final judgment of the first litigation. "Implicit in this concept is the principle that a party *had the opportunity* to raise a claim in the first adjudication, but failed to do so."[96] There are only two ways to object to an executory process proceeding: "(1) filing an injunction to arrest the seizure and sale, or (2) filing a suspensive appeal from the order of seizure and sale."[97]  As noted above, there are three grounds under La. C.C.P. art. 2751 to enjoin the sale of a seized property, provided security has been furnished – that the debt is legally unenforceable, that it has been extinguished, or that the procedure required by law for an executory proceeding has not been not followed. La. C.C.P. art. 2753 adds prematurity, forgery, fraud, violence, or liquidated claim to be

---

[94] *Classen v. Hoffman*, 947 So.2d 76 (La. App. 5th Cir. 2006).

[95] 843 So. 2d 1049, 1052, 1053 (La. 2003); *see also City of Bastrop v. Harris*, 198 So. 3d 163, 166 (La. Ct. App. 2016).

[96] *City of Bastrop*, 198 So. 3d 163, 166 (citing *Ken Lawler Builders, Inc. v. Delaney*, 840 So. 2d 672, 674 (La. Ct. App. 2003) (emphasis added).

[97] La. Code Civ. P. art. 2642.

pled in compensation, as grounds to enjoin the sale not requiring the furnishing of security. In this lawsuit, Plaintiff seeks monetary damages for breach of contract, detrimental reliance, unfair trade practices, violations of the Fair Debt Practices Act, and conversion. Defendants have cited to no law – and this Court has found none – that would have allowed Plaintiff to bring these causes of action to arrest the seizure and sale of the property in the executory proceeding. The Plaintiff did not have the opportunity to raise these claims in Action No. 2017-12331 and, as a result, the fourth requirement of res judicata has not been met.

The fifth requirement of res judicata is that the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation. Defendants argue the cause or causes of action asserted in Action No. 2020-11287 arose out of the transaction or occurrence that was the subject matter of Action No. 2017-12331 and, as a result, were compulsory counterclaims required to be asserted in Action No. 2017-12331.

La. C.C.P. art. 1061 governing reconventional demands requires that causes of action arising out of the transaction or occurrence that is the subject matter of the principal action must be asserted,

> The defendant in the principal action, except in an action for divorce under Civil Code Article 102 or 103 or in an action under Civil Code Article 186, shall assert in a reconventional demand all causes of action that he may have against the plaintiff *that arise out of the transaction or occurrence* that is the subject matter of the principal action.[98]

---

[98] La. Code Civ. Proc. Art. 1061(B) (emphasis added). Article 1061 and Section 13:4231 must be read *in pari materia*. *Classen v. Hofmann*, 947 So. 2d 76, 80 (La. Ct. App. 2006).

The article's federal counterpart, Federal Rule of Civil Procedure 13 – "Counterclaim and Crossclaim" – reads the same.[99] In addressing the phrase "aris[ing] out of the transaction or occurrence" under La. C.C.P. art. 1061 and Rule 13, the Fifth Circuit has adopted the "logical relationship" test.[100] A "logical relationship" exists when either "the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendants."[101]

"The central inquiry is not whether the second action is based on the same cause of action, but whether the second action asserts a cause of action which arises out of the transaction or occurrence which was the subject matter of the first action."[102] The essential facts for proving the claims of Plaintiff in Action No. 2020-11287 and those of Defendants in Action No. 2017-12331 are not so closely related that "resolving both sets of issues in one lawsuit would yield judicial efficiency."[103] Instead, the issues in Action No. 2020-11287 are only collaterally related to those in Action No. 2017-12331 .[104] In a petition for executory process, the creditor need only provide "sufficient written proof that the creditor is entitled to enforce a mortgage or privilege by executory process."[105] The enforcement of the mortgage by executory process is only peripherally related to the claims asserted by Plaintiff in Action No. 2020-11287, which require proof of a much broader array of facts. The same operative facts do not serve as the basis of both the Action

---

[99] Fed. R. Civ. P. 13(a)(1)(A).
[100] *Nayani v. Horseshoe Ent.*, No. 3:06-CV-01540-M, 2007 WL 1288047, at *3 (N.D. Tex. May 2, 2007) (citing *Montgomery Elevator Co. v. Bldg. Eng'g Servs. Co., Inc.*, 730 F.2d 377, 380 (5th Cir. 1984)).
[101] *Songcharoen v. Plastic & Hand Surgery Assocs., P.L.L.C.*, 561 F. App'x 327, 341 (5th Cir. 2014) (citing *Montgomery Elevator Co.*, 730 F.2d at 380 (citation and internal quotation marks omitted)).
[102] *Gladney v. Anglo-Dutch Energy, L.L.C.*, 280 So. 3d 964, 971 (La. Ct. App. 2019).
[103] *Nayani*, 2007 WL 1288047, at *3 (quoting *Jones v. Ford Credit Co.*, 358 F.3d 205, 210 (2d Cir. 2004)).
[104] *Chauvin v. State Farm Mutual Automobile Insurance Company*, 2007 WL 2903321 (E.D.LA. 2007).
[105] 1A Frank L. Maraist, *La. Civ. L. Treatise, Civ. Proc.–Special Proceed.* § 3.3 (2014).

No. 2017-12331 and Action No. 2020-11287. Claim preclusion is inapplicable in this case.[106]

Under the principle of issue preclusion set forth in Section 13:4231(3), "[a] judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment." The Defendant's argument of res judicata is based on the writ of seizure and sale in Action No. 2017-12331, which dealt only with the sale of the property subject to the mortgage. None of Plaintiff's causes of action in the second amended complaint was *actually litigated* in Action No. 2017-12331. Plaintiff's current claims of breach of contract, detrimental reliance, unfair trade practices in violation of Section 51:1409, conversion, and unfair debt collection practices in violation of the Fair Debt Collection Practices Act were not actually litigated and determined in the Louisiana state court by the writ of seizure and sale, nor were they essential to the state court's grant of the writ. There is no valid and final order conclusive between the parties on these causes of action. Plaintiff's claims are not barred by issue preclusion.

### III.   Carrington and JPMMAC are exempt from claims for unfair trade practices in violation of LUTPA.

Plaintiff alleges Carrington reneged on its promise made in the September 27, 2017 letter to remove Plaintiff's account from foreclosure when, in November 2019, Carrington re-instituted foreclosure proceedings in Action No. 2017-12331.[107] Plaintiff alleges the re-

---

[106] Moreover, even if claim preclusion applied, Louisiana law provides that an earlier judgment does not bar another action by the plaintiff when exceptional circumstances justify relief from the res judicata effect of the judgment. La. Rev. Stat. § 13:4232(A)(1). The comments to Section 13:4232 refer to Federal Rule of Civil Procedure 60(b) as guidance for what constitutes "exceptional circumstances." *Id.* cmt. Based on the broad discretion given to courts under Rule 60(b), and the lack of actual injustice which will ensue, the Court finds exceptional circumstances would justify relief in this case.

[107] R. Doc. 33 at ¶ 54.

institution of the foreclosure proceedings violated La. R.S. 51:1406, the Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA).[108] Plaintiff alleges that Carrington made misrepresentations and deceived her by making promises to remove Plaintiff's account from foreclosure in 2017 but then proceeding with the foreclosure in 2019 without any effort to contact Plaintiff and warn her of its impending action.[109] Plaintiff alleges she did not learn of Carrington's actions until she was served with the Notice of Seizure on November 27, 2019,[110] Presumably, Plaintiff also brings this claim against JPMMAC because, as the principle, it is responsible for the acts of its agent Carrington. The Defendants argue JPMMAC and Carrington are expressly exempt from LUTPA's provisions.[111]

> LUTPA's provisions expressly exclude its application to:
>
> Any federally insured financial institution, its subsidiaries, and affiliates or any licensee of the Office of Financial Institutions, its subsidiaries, and affiliates or actions or transactions subject to the jurisdiction of the Louisiana Public Service Commission or other public utility regulatory body, the commissioner of financial institutions, the insurance commissioner, the financial institutions and insurance regulators of other states, or federal banking regulators who possess authority to regulate unfair or deceptive trade practices.[112]

Carrington, a mortgage loan originator, is registered with the Nationwide Mortgage Licensing System[113] and is regulated by the Louisiana Office of Financial

---

[108] *Id.* at ¶¶ 54, 55.

[109] *Id.*

[110] *Id.*

[111] R. Doc. 40-1 at 15.

[112] La. Rev. Stat. § 51:1406(1).

[113] Carrington's registration with the Nationwide Mortgage Licensing System is documented through the NMLS website. R. Doc. 40-5. The registration, noting its applicability in Louisiana, is publicly recorded and may be accessed through a link to the NMLS website from the Louisiana Office of Financial Institution's website. When analyzing a motion to dismiss under Rule 12(c), a court may look to the pleadings and any judicially-noted facts. The Court takes judicial notice of the registration pursuant to Federal Rule of Evidence 201(c)(2). *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 313, (5th Cir. 2002).

Institutions.[114] JPMMAC is a wholly owned subsidiary of Chase and is insured by the Federal Deposit Insurance Corporation and regulated by the Office of the Comptroller of the Currency and the Consumer Financial Protection Bureau.[115] Because JPMMAC is a subsidiary of a federally insured financial institution and is itself a federally insured financial institution, and because Carrington is subject to the jurisdiction of the Office of Financial Institutions, they are exempt from liability under LUTPA as a matter of law.[116] Defendants' motion for judgment on the pleadings is granted with respect to Plaintiff's claims against Carrington and JPMMAC under LUTPA.

## IV.   Plaintiff's claims against JPMMAC and Carrington for breach of contract and detrimental reliance are prohibited by the Louisiana Credit Agreement Statute.

Plaintiff asserts causes of action for breach of contract and detrimental reliance against Carrington and JPMMAC.[117] Plaintiff's claim for breach of contract is based on the September 27, 2017 letter from Carrington and a November 18, 2017 telephone conversation she had with a Carrington Loan Supervisor.[118]   Plaintiff alleges that, to redress the grievances in her CFPB Complaint, Carrington first promised in the September 27, 2017 letter to remove Plaintiff's account from foreclosure, to waive any fees associated with the foreclosure proceedings, return her account to the position in which it had been, and suppress Plaintiff's credit reporting for 60 days.[119] Plaintiff alleges

---

[114] La. R.S. § 6:1081, *et seq.*

[115] Chase's Federal Deposit Insurance Corporation registration certificate is publicly recorded and may be accessed through the FDIC's website. R. Doc. 40-5. Pursuant to Federal Rule of Evidence 201(c)(2), the Court takes judicial notice of the certificate.

[116] *Bank One, N.S. v. Colley*, 294 F. Supp. 2d 864 (M.D. La. 2003).

[117] R. Doc. 33 at ¶ 38-52. With respect to these claims against JPMMAC, Plaintiff alleges Carrington acted as JPMMAC's agent, and JPMMAC is bound to perform any contracts Carrington made with Plaintiff.

[118] The motion for judgment on the pleadings does not address Plaintiff's claim for breach of contract against Chase, which did not join in the motion.  In that Count, Plaintiff alleges that Chase breached her original mortgage agreement. All claims against Chase have been dismissed. R. Doc. 109.

[119] R. Doc. 33 at ¶ 27.

Carrington breached the September 27, 2017 letter when it reinstituted the executory process proceeding in November 2019 without any advance notice to her.

Plaintiff's claim for detrimental reliance also is based on both the letter of September 17, 2017 and the November 18, 2017 telephone conversation with the Carrington Loan Supervisor. With regard to the telephone conversation, Plaintiff alleges she reached an oral agreement with Carrington during that conversation (the "oral agreement") regarding the amount necessary to bring her account current and her ability to make her December payment by phone so long as she made the payment before her deadline of December 16, 2017.[120] Plaintiff alleges she accepted the terms of that oral agreement, which created a contract under Louisiana law.[121] Plaintiff maintains the Loan Servicing Supervisor represented the amount to be paid to fully cure arrears on her loan was $6,468.27, and that he accepted that amount by an electronic funds transfer from her father's checking account.[122] Plaintiff alleges she relied to her detriment on Carrington's representation that, if she paid this amount, her account would be current. Plaintiff also contends she attempted to make her December loan payment by telephone on December 9, 2017 but was informed her loan remained in foreclosure status, and the payment would not be accepted. Plaintiff alleges Carrington issued a refund check to her, but she never negotiated the check.[123]

JPMMAC and Carrington argue Plaintiff's claims fail as a matter of law pursuant to La. Rev. Stat. § 6:1121, *et seq.*, the Louisiana credit agreement statute ("LCAS").[124]

---

[120] *Id*. at ¶ 28, 44.
[121] R. Doc. 52 at 12.
[122] R. Doc. 33 at ¶ 28.
[123] *Id*. at 33.
[124] R. Doc. 40-1 at 7.

Because the LCAS "operates as a 'statute of frauds' for the credit industry,"[125] in that its purpose is to prevent potential borrowers from bringing claims against lenders based on unwritten agreements, the Fifth Circuit has held the LCAS precludes all actions for damages arising from unperfected credit agreements, regardless of the theory on which they are based.[126] Defendants argue the LCAS applies because Carrington is a "creditor" as defined in Section 6:1121(2), and the causes of action for breach of contract and detrimental reliance claims are unenforceable under the statute.[127]  Because the Court concludes that Plaintiff's oral communications with Carrington's loan servicing representative on November 18, 2017 and the September 17, 2017 letter are unperfected credit agreements, and because the LCAS precludes all actions for damages arising from unperfected credit agreements, regardless of the theory on which they are based, Plaintiff's claims for breach of contract and detrimental reliance based on any alleged oral agreement and the September 27, 2017 letter are foreclosed.

A "creditor," as defined by the LCAS, is "a financial institution or any other type of creditor that extends credit or extends a financial accommodation under a credit agreement with a debtor."[128] In turn, a financial institution "means a bank, savings and loan association, savings banks, or credit union authorized to transact business in this state."[129] Carrington holds a Louisiana residential mortgage lending license and extended

---

[125] *Whitney Bank v. SMI Co. Glob., Inc.*, 949 F.3d 196, 205 (5th Cir. 2020).
[126] *Jesco Constr. Corp. v. NationsBank Corp.,* 321 F.3d 501 (5th Cir. 2003); *see also Saragusa v. Countrywide*, Civ. A. No. 14-2717, 2016 WL 1059004, at *1, n.4 (E.D. La. Mar. 17, 2016) (recognizing claims against mortgagee and servicer premised on "fraud, misrepresentation, and unfair trade practices under Louisiana law" failed to state a claim as a matter of law under the LCAS).
[127] R. Doc. 40-1 at 7.
[128] La. Rev. Stat. § 6:1121(2).
[129] *Id.* § 6:1121(4).

financial accommodations to Plaintiff, a debtor, in connection with her mortgage loan.[130] As noted above, Carrington, a mortgage loan originator, is registered with the Nationwide Mortgage Licensing System[131] and is regulated by the Louisiana Office of Financial Institutions.[132] The Court finds Carrington is a "creditor" under the LCAS.

A "credit agreement" includes an agreement "to lend or forbear repayment of money or goods or to otherwise extend credit, or make any other financial accommodation."[133] To be enforceable, a credit agreement must be "in writing, express[] consideration, set[] forth the relevant terms and conditions, and [be] signed by the creditor and the debtor."[134] Unless the credit agreement satisfies all of the conditions outlined in Section 6:1122, a debtor may not maintain an action on it.[135] Any alleged claim arising from Plaintiff's November 2017 conversation with the Carrington representative is unenforceable under the LCAS as Plaintiff can point to no signed agreement between the parties showing an agreement to accept a certain sum by telephone to cure the loan's arrears.[136] Plaintiff's claim for breach of contract and detrimental reliance based on the November 2017 conversation is thus precluded as a matter of law as it is based on an unperfected credit agreement with Carrington.

Neither is the September 27, 2017 letter to extend financial accommodations to Plaintiff enforceable as a credit agreement: The letter did not express consideration, did not set forth the relevant terms and conditions of the agreement, and it is not signed by

---

[130] R. Doc. 56 at 8.
[131] *See* supra n. 92.
[132] *See* supra n. 93.
[133] La. Rev. Stat. § 6:1121(1).
[134] La. Rev. Stat. § 6:1122.
[135] *Id.*
[136] R. Doc. 40-1 at 9.

the creditor and debtor, as the LCAS requires.[137]  To counter these conclusions, Plaintiff argues Carrington's September 27, 2017 letter is a settlement agreement rather than a credit agreement.[138] Plaintiff contends Carrington's September 27 letter was sent to her in compliance with the administrative complaint process established by the Dodd-Frank Act[139] and provided Plaintiff relief in the form of removing her account from foreclosure, waiving any fees associated with the foreclosure proceedings, returning Plaintiff's account to the position in which she would have been but for Carrington's error, and suppressing Plaintiff's credit reporting for 60 days from the receipt of her complaint.[140]

In support of her argument that the September 27, 2017 letter from Carrington is not a "credit agreement" under the LCAS, Plaintiff cites *Durham, Inc. v. Vanguard Bank & Trust Co.*,[141] in which a mortgagor brought suit in Louisiana state court alleging breach of contract and negligent misrepresentation. The lawsuit alleged the mortgagee bank had recorded a quitclaim deed on the mortgaged property following the alleged nonpayment of a sum due by the mortgagor.[142] The bank removed the lawsuit to federal district court and moved to dismiss the mortgagor's suit on the basis of the LCAS, arguing the agreement at issue was a "credit agreement" under the LCAS, and the alleged oral modifications were unenforceable.[143] The court reasoned that, by its terms, the agreement at issue fell within the scope of the definition of "credit agreement" as it agreed to "forbear the repayment of money."[144] However, the agreement also constituted a compromise

---

[137] R. Doc. 40-1 at 8; *see* R. Doc. 40-4 at 1-7.
[138] R. Doc. 52 at 11-12.
[139] 12 U.S.C. § 5334(b).
[140] R. Doc. 40-3 at 1-7.
[141] 858 F. Supp. 617, 620 (E.D. La. 1994).
[142] *Id.* at 618.
[143] *Id.*
[144] *Id.* at 621.

entered into by consent of the parties to settle a lawsuit.[145] The court concluded because the underlying purpose was to compromise and settle issues included in two lawsuits between the parties, and did not specifically extend credit to the defendant, the agreement was a settlement agreement, rather than a credit agreement.[146] Plaintiff argues that, in this case, the relief granted to her in Carrington's September 27, 2017 letter does not fit within the definition of "credit agreement" under La. Rev. Stat. § 6:1121.[147] Plaintiff also contends this is a Rule 12(c) motion so the Court is bound to accept the allegations of the complaint as true and may not resolve factual disputes between the parties.

Defendants respond that Carrington's September 27, 2017 letter does not constitute a compromise or settlement agreement.[148] Defendants point out the Louisiana Civil Code defines a compromise as "a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship."[149] Defendants argue Plaintiff did not accept the September 27, 2017 letter's purported terms in writing, and therefore the parties did not form a settlement agreement.[150]

The Court finds the September 27, 2017 letter did not constitute a compromise or settlement agreement. Plaintiff and Defendants were not involved in litigation at the time, and Plaintiff had filed only a grievance with the CFPB. In addition, the September 27, 2017 letter did not end any dispute between Plaintiff and Defendants. Indeed, the disputes between Plaintiff and Defendants have long outlasted the September 27 letter as

---

[145] *Id.*
[146] *Id.*
[147] R. Doc. 52 at 12.
[148] R. Doc. 56 at 7.
[149] La. Civ. Code art. 3071.
[150] R. Doc. 56 at 13.

evidenced by the filing of this lawsuit.[151] Moreover, there is no indication from the record of an offer or acceptance by Carrington or Plaintiff.[152] In the September 27 letter, Carrington made a financial accommodation to Plaintiff when it agreed not to exercise certain rights because one of its representatives had provided misinformation to Plaintiff. In short, it retracted penalties that it had imposed on Plaintiff for missing several mortgage payments. The LCAS broadly defines a credit agreement as an agreement "to lend or forbear repayment of money or goods or to otherwise extend credit, *or make any other financial accommodation.*"[153] The accommodation provided by the September 27 letter relieved Plaintiff from certain obligations under her earlier agreement; it did not create a compromise or settle the dispute between them.

Plaintiff also argues the terms announced in the September 27, 2017 letter, once accepted by Plaintiff, created an entirely new contract – as that term is more broadly defined than credit agreement – under Louisiana law.[154] Plaintiff notes "[a] contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished."[155] Further, Plaintiff agrees that "[a] contract is formed by the consent of the parties established through offer and acceptance," and argues further that, "[u]nless the law prescribes a certain formality for the intended contract, offer and acceptance may

---

[151] In the letter, Carrington notes that it continued to dispute some of Plaintiff's assertions and refused to give her much of the relief that she had requested. R. Doc. 40-4 at p. 5 ("After reviewing your account and conducting a full investigation into your allegations, CMS respectfully disagrees with your assertion that you were not informed of the service transfer from JPMorgan to CMS."); *Id.* at p. 6 (". . . not all fees will be waived as you requested."); *Id.* (Moreover, our review concludes that CMS's credit reporting has complied with applicable law at all relevant times; thus, your credit history will not be revised.").

[152] *Aloisio v. Christina*, 146 So. 3d 564, 566 (La. Ct. App. 2014) (citing *Elder v. Elder Enters., Ltd.*, 948 So.2d 348, 351 (La. Ct. App. 2007) ("A contract is formed by the consent of the parties established through offer and acceptance. La. C.C. art. 1927. Thus, before a district court can find the existence of a valid written compromise agreement, it must find an offer and an acceptance.")).

[153] La. Rev. Stat. § 6:1121(1) (emphasis added).

[154] R. Doc. 52 at 12.

[155] La. Civ. Code Art. 1906.

be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent."[156] Plaintiff argues she created a contract through her conduct when she made a payment under her credit agreement and Carrington accepted that payment.[157]

Defendants, in reply, argue that no separate contract was created, but rather, the 2017 letter falls squarely under the LCAS.[158] In support of their arguments, Defendants cite *Bernard v. Iberia Bank*,[159] in which the plaintiffs alleged the original loan had been forgiven and a new loan agreement created when the predecessor of the defendant bank agreed to different monthly payments.[160] On a motion for summary judgment, the court considered La. Rev. Stat. § 6:1123, which states:

A. The following actions shall not give rise to a claim that a new credit agreement is created, unless the agreement satisfies the requirements of R. S. 6:1122:

******

(3) The agreement of a creditor to take or not to take a certain action, such as entering into a new credit agreement, forbearing from exercising remedies under a prior credit agreement, or extending installments due under a prior credit agreement.

B. A credit agreement shall not be implied from the relationship, fiduciary or otherwise, of the creditor or the debtor.[161]

Plaintiffs in that case argued the letter at issue met two of the requirements, as it was in writing and signed by both the creditor and the debtor.[162] However, the *Bernard* court determined parol evidence would be necessary, but was not admissible, to show a prior

---

[156] La. Civ. Code Art. 1927.
[157] R. Doc. 52 at 13.
[158] R. Doc. 56 at 6.
[159] 832 So. 2d 335 (La. Ct. App. 2002).
[160] *Id.* at 356-57.
[161] La. Rev. Stat. § 6:1122.
[162] *Bernard*, 832 So. 2d at 357.

or contemporaneous agreement varying the terms of the written contract.[163] The court held the letter was insufficient to establish the existence of a new credit agreement because it did not recite the consideration or the relevant terms of the alleged new credit agreement.[164] The court reasoned, "[a]t best, the letter represents the granting of an indulgence by [defendant bank] and the bank's willingness to make financial accommodations under the original credit agreement."[165]

Defendants argue that Carrington's September 27, 2017 letter is similar, in that it did not form a new credit agreement because it did not express consideration, did not set forth the relevant terms and conditions, and it is not signed by both the creditor and the debtor.[166] Defendants conclude the September 27, 2017 letter did not create a new contract or credit agreement but rather expressed an agreement by Carrington to make financial accommodations to Plaintiff.[167]

The law is clear:

A.   The following actions shall not give rise to a claim that a new credit agreement is created, unless the agreement satisfies the requirements of R. S. 6:1122:

******

(3)   The agreement of a creditor to take or not to take a certain action, such as entering into a new credit agreement, forbearing from exercising remedies under a prior credit agreement, or extending installments due under a prior credit agreement. [168]

Section 6:1122, in turn, provides that any new agreement requires consideration, must set forth the relevant terms and conditions, and be signed by the creditor and the debtor. As

---

[163] La. Civ. Code. art. 1848.
[164] *Bernard*, 832 So.2d at 358.
[165] *Id.*
[166] R. Doc. 56 at 7.
[167] *Id.*
[168] La. Rev. Stat. § 6:1123.

noted, the September 27, 2017 letter does not satisfy Section 6:1122's requirements. The letter only forbore Carrington from exercising remedies it had under the earlier credit agreement. As in *Bernard*, the September 27, 2017 letter is no more than an indulgence granted by Carrington when, after learning that one of its representatives had given Plaintiff misinformation about her account, it decided to remove Plaintiff's account from foreclosure, waive any fees associated with the foreclosure proceeding, and suppress her credit reporting for 60 days. Accordingly, because the Court concludes that Plaintiff's oral conversation with Carrington's loan servicing representative in November 2017 and the September 17, 2017 letter are unperfected credit agreements, and because the LCAS precludes all actions for damages arising from unperfected credit agreements, regardless of the theory on which they are based, Plaintiff's claims for breach of contract and detrimental reliance based on any alleged oral agreement and the September 27, 2017 letter are foreclosed.[169]

## V.   Contractual Nonpecuniary Damages

Plaintiff alleges she sustained damages for the loss or her home and property as a direct consequence of Carrington and JPMMAC's breaches of contract. Plaintiff thus seeks nonpecuniary damages for emotional distress under La. Civil Code Article 1998.[170] Plaintiff further contends the contracts between her and Carrington and JPMMAC were intended to gratify the nonpecuniary interest of purchasing and preserving Plaintiff's first and only home, where she raised her daughter and which allowed her to live next to her elderly parents.[171]

---

[169] Because no cause of action for breach of contract or detrimental reliance lies against Carrington, JPMMAC cannot be liable as its principal. *See supra* note 96.
[170] R. Doc. 33 at ¶47.
[171] *Id.*

In their motion for judgment on the pleadings, Defendants argue Plaintiff is not entitled to nonpecuniary damages.[172] They note that under Louisiana law, there are only two methods for recovery of non-pecuniary damages for breach of contract. First, "[d]amages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss."[173] Second, "[r]egardless of the nature of the contract, these damages may be recovered also when the obligor intended, through its failure, to aggrieve the feelings of the obligee."[174] Defendants argue Plaintiff's "request for nonpecuniary damages fails because mortgage transactions do not satisfy non-pecuniary interests, and because she cannot show defendants intended to inflict grief."[175]

As an initial matter, this Court has held that breach of contract claims against Carrington and JPMMAC based on the September 2017 letter or the November 2017 telephone conversation with Carrington's Loan Supervisor are precluded by the LCAS. It is axiomatic that a plaintiff cannot recover contractual nonpecuniary damages when she has no cause of action for breach of contract.[176] Even were that not the case, however, the Court finds that Plaintiff has failed to sufficiently plead her claim for nonpecuniary damages.

---

[172] R. Doc. 40-1 at 13.

[173] La. Civ. Code art. 1998.

[174] *Id.*

[175] R. Doc. 40-1 at 19.

[176] *See, e.g., Gray v. McCormick*, 663 So. 2d 480, 488 (La. Ct. App. 1995) ("In the present case, since we find that the Grays failed to prove that a contract existed with the McCormicks, it is clear that nonpecuniary damages cannot be awarded. Simply stated, without a contract, the award of nonpecuniary damages under Article 1998 does not come into play.").

*Floyd v. Wells Fargo Home Mortgage Company* ("*Floyd*") is instructive. In *Floyd*, the district court considered whether the plaintiffs were entitled to nonpecuniary damages.[177] The plaintiffs had asserted a claim against the defendant, their mortgagee, alleging the defendant used improper accounting practices that resulted in financial harm to plaintiffs in the form of high interest rates, unfavorable credit reports, high monthly payments, and other financial injury.[178] The defendant moved to dismiss the plaintiffs' claims. The district court stated the two methods for recovery of nonpecuniary contractual damages under Louisiana law are: "(1) proof that the contract by its nature was intended to 'gratify a nonpecuniary interest' or (2) proof that the obligor intended through its breach of contract to 'aggrieve the feelings of' the obligee."[179] In considering the first prong, the court noted "a mortgage or loan contract does not by its nature satisfy a nonpecuniary interest."[180] And as to the second prong, the court noted the plaintiffs' complaint did not allege defendant intended to aggrieve plaintiffs' feelings.[181] The court held plaintiffs were not entitled to nonpecuniary damages because they had failed to plead facts that stated a claim under either prong of Article 1998.

In this case, Plaintiff argues *Floyd* is distinguishable on the facts.[182] Plaintiff contends that a foreclosure results in much more serious distress than the facts alleged in

---

[177] 848 F.Supp.2d 635, 645-46 (E.D. La. 2012).
[178] *Id.* at 637-38.
[179] *Id.* at 645.
[180] *Id.* (citing *Morris v. Deluxe Check Printers, Inc.*, 395 So.2d 927, 930 (La. Ct. App. 1981) (rejecting the plaintiffs' contention that their contract to purchase checks satisfied an intellectual interest due to their desire to maintain a relationship with a bank and to maintain good credit standing)).
[181] *Id. See also Davis v. Allstate Ins. Co.*, 2009 WL 122761 at *7 (E.D. La. Jan. 15, 2009) (where the plaintiff did not allege that the defendant intended to aggrieve or hurt her feelings, she did not state a claim for relief under La. Civ. C. Art. 1998); *Pinero v. Jackson Hewitt Tax Serv., Inc.*, 594 F. Supp. 2d 710, 718 (E.D. La. 2009) (where plaintiff did not allege that the motivating factors behind the breach of contract was the desire to aggrieve plaintiff's feelings, plaintiff did not state a claim for relief under La. Civ. Code art. 1998).
[182] R. Doc. 52 at 19.

*Floyd*.[183] Further, Plaintiff maintains the breach of contract in *Floyd* is different from the breach in this case, "where Carrington breached a separate contract to remove Plaintiff's account from foreclosure."[184] Plaintiff argues the impact of the foreclosure had significant impacts on her well-being, especially as it happened during the COVID-19 pandemic and separated Plaintiff from her elderly parents.[185] Considering this, Plaintiff argues her claim for nonpecuniary damages should not be dismissed at this stage, but should be preserved for trial.[186] Defendants argue the location of Plaintiff's property and the event of the pandemic do not convert the nature of her contract to cover nonpecuniary damages.[187] Plaintiff does not reply to this argument in her sur-reply.[188]

Not only has this Court held there is no breach of contact claim against Carrington, but Plaintiff failed to allege that the contract was intended to gratify a valid nonpecuniary interest.[189] Professor Saul Litvinoff has explained that a contract intended to gratify a nonpecuniary interest means a contract made "to satisfy an interest of a spiritual order," and includes contracts to make works of art, contracts to conduct scientific research, and other contracts pertaining to sentimental matters.[190] As noted above, "a mortgage or loan contract does not by its nature satisfy a nonpecuniary interest."[191] Further, Plaintiff failed to allege that Defendants intended to aggrieve Plaintiff's feelings, despite that being the

---

[183] *Id.*
[184] *Id.* at 20.
[185] *Id.*
[186] *Id.*
[187] R. Doc. 56
[188] *See* R. Doc. 59.
[189] *See* R. Doc. 33.
[190]  6 Saul Litvinoff, La. Civ. L. Treatise § 6.12 (2d ed.).
[191] *Floyd*, 858 F. Supp. 2d at 645 (citing *Morris v. Deluxe Check Printers, Inc.*, 395 So.2d 927, 930 (La. Ct. App. 1981) (rejecting the plaintiffs' contention that their contract to purchase checks satisfied an intellectual interest due to their desire to maintain a relationship with a bank and to maintain good credit standing)).

outcome of the alleged breach of contract.[192] Accordingly, Plaintiff has not stated a claim that supports the award of nonpecuniary damages.

## VI. Plaintiff's Claim for conversion against Carrington and JPMMAC fails.

Plaintiff alleges that despite her property being sold at sheriff's sale to JPMMAC on March 11, 2020, Carrington continues to hold $6,468.27 of Plaintiff's money.[193] Plaintiff alleges she never negotiated the refund check Carrington sent to her in December 2017, and this wrongful and indefinite holding of Plaintiff's money by Carrington constitutes a conversion.[194]  Stated more precisely, however, Plaintiff's allegation is that Carrington converted a payment *made from her father's checking account* on November 18, 2017.[195]

Defendants first argue that Plaintiff has no standing to assert the claim for conversion of the $6,468.27 electronic transfer because it issued from her father's bank account. To maintain standing to raise a claim in federal court, a plaintiff must be the proper proponent of the particular legal right upon which the suit is based.[196] A litigant's "unsupported assertion of ownership is insufficient to establish standing."[197] To enforce a third-party's rights, a litigant must show (1) she and the person whose rights she asserts

---

[192] *See Davis v. Allstate Ins. Co.*, Civ. A. No. 07-4572, 2009 WL 122761, at *7 (E.D. La. Jan. 15, 2009) (holding that when the plaintiff did not allege that the defendant intended to aggrieve or hurt her feelings, she did not state a claim for relief under article 1998); *Pinero v. Jackson Hewitt Tax Serv., Inc.*, 594 F. Supp. 2d 710, 718 (E.D. La. 2009) (arriving at same result when plaintiff did not allege that the motivating factor behind the breach of contract was a desire to aggrieve the plaintiff's feelings).
[193] R. Doc. 33 at ¶ 63.
[194] *Id.* at ¶¶ 28, 29, 63.
[195] *Id.* at ¶ 63.
[196] *Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.*, 854 F.2d 745, 748 (5th Cir. 1988) (citation omitted).
[197] *Kadonsky v. United States*, 216 F.3d 499, 508 (5th Cir. 2000).

have aligned interests; (2) she is as "effective a proponent of that right as the third party"; and (3) the third party is not able to assert his own right.[198]

In this case, Plaintiff admits the electronic funds originated from her father's account.[199] She does not allege that she has an ownership or property interest in the electronic funds.[200] Most importantly, she fails to allege that her father is unable to bring – or is hindered from bringing – the conversion claim against Carrington and JPMMAC himself.  She thus has not alleged nor does the Court find that Plaintiff has standing to sue on behalf of her father to recover the funds.[201]

Even were the Court to find Plaintiff has standing to assert the claim for conversion, it is abundantly clear that any claim for conversion has prescribed. Plaintiff's father transferred the funds from his account in November 2017. Plaintiff filed her Verified Petition for Damages in state court, over two years later, on March 10, 2020.[202] Conversion is a tort subject to a one-year prescriptive period under Louisiana law.[203] "The one-year prescriptive period begins to run on the date a plaintiff discovered or should have discovered the facts upon which his or her cause of action is based."[204] Plaintiff alleges Carrington converted the payment on November 18, 2017.[205] She learned

---

[198] *Canfield Aviation, Inc.*, 854 F.2d at 748 (citation omitted); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (asking whether the party asserting the right has a close relationship with the person who possesses the right and whether there is a hindrance to the possessor's ability to protect his own interests to find third-party standing (citations omitted)).

[199] R. Doc. 33 at ¶ 28.

[200] Even though Carrington issued the check to Plaintiff herself, Plaintiff has never argued that she is the owner of the funds as she has consistently admitted the funds came from her father's bank account.

[201] Moreover, Carrington refunded the electronic funds to her a month later in December 2017. R. Doc. 33 at ¶ 29.  Plaintiff simply failed to ever negotiate the check.  *Id.*

[202] R. Doc. 1-1.

[203] *Metro. Wholesale Supply, Inc. v. M/V Royal Rainbow*, 12 F.3d 58, 62 (5th Cir. 1994) (citing La. Civ. Code art. 3492 and *Blunt v. City of New Orleans*, 505 So. 2d 94, 95 (La. Ct. App. 1987)).

[204] *Id.* (citing *Griffin v. Kinberger*, 507 So. 2d 821, 823 (La. 1987)).

[205] R. Doc. 33 at ¶¶ 38-39.

Carrington attempted to refund the payment in December 2017, and she received a refund check weeks after making the payment.[206] Plaintiff knew or should have known by December 2017 that Carrington had allegedly converted her father's funds. Plaintiff's conversion claim is thus prescribed on its face.

## CONCLUSION

Defendants' motion for judgment on the pleadings is **GRANTED** with respect to all claims against JP Morgan Mortgage Acquisition Corp. and all claims against Carrington Mortgage Services, L.L.C. except Plaintiff's claim for unfair debt collection practices under the Fair Debt Collections Act, 15 U.S.C. § 1692a.[207]

**New Orleans, Louisiana, this 19th day of May, 2021.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[206] *Id.*
[207] *See* note 78.

35